Case number 24-3444 from the Western District of Missouri, Rhonda Burnett et al. v. Spring Way Center et al., etc. May it please the Court, I'm... Are you Mr. Nye? Yes. All right. Thank you. I think I'm up correctly this time. Yes. Patrick Nye on behalf of South Carolina Objectors. This Court is challenged with finding any addition that the lower court exercised its role as a fiduciary to absent class members. Now, the Court mentioned something about a declaration. That was by an interested party. The only thing else that the Court had was literally representations of counsel that the class settlement was fair. What else would counsel say? The lower court said that it was adequate without reviewing any financial data of the settling parties. Data existed because it was allegedly disclosed to plaintiff's counsel by defense counsel. The question becomes, why didn't plaintiff's counsel provide it to the Court? Or more importantly, why didn't the Court request it? Not only did the Court not require it, but it denied objectors timely motion for discovery of financial records. Objectors even employed a distinguished economist from South Carolina who submitted an affidavit to the lower court. Explaining what documents he would need to make a proper evaluation. The Sixth Circuit has said that where discovery materials are available that predate a settlement, objectors should seek that information from the settling parties and that information should be supplied. We tried to get that information from the settling parties and it was refused. Newberg on class actions and the manual on complex litigation supports that theory that that information should be supplied. This very circuit has said that the lower court must act as a fiduciary serving as a guardian for the absent class members. Why would the lower court fail to act as a fiduciary? The bottom line is that the lower court demonstrated an overt dislike for objectors. What happened was there was an interested party that I believe the court viewed as an objector. A realtor from Las Vegas who made some observations against the lower court and the lower court subsequently put that information on the record. After that, the lower court required not only objectors' attorneys, but objectors to appear at every hearing. That would mean that four objectors from South Carolina would have to fly halfway across the country on four different occasions to get possibly $15 to $30 per settlement. No federal circuit court has ever held that objectors and their attorneys have to appear in person. Attorneys for the South Carolina objectors nonetheless appeared at every hearing, but the lower court still waived the objections since the objectors themselves did not appear. The lower court's actions were punitive and draconian towards the objectors and gave light as to why the court didn't act as a fiduciary. The clear language of the United States Supreme Court case of Phillips Petroleum v. Schutz says that absent class members must receive notice plus an opportunity to be heard at a hearing either in person or through counsel, but not both. The lower court denied the objectors due process when it said in the class notice that all they had to do was submit a written objection. Now, the elephant in the room, the theft of the $1.7 billion verdict from a class of 600,000 Missourians to be distributed instead to 35 million home sellers in the United States. There is case law that says that a class can somewhat be enlarged from an original verdict, but this is not somewhat being enlarged. This is going from 600,000 to 35 million. The Burnett verdict was for Missourians, not South Carolinians, and not for class members in other states. We should be allowed to proceed in our own states with the losses we have filed, which the lower court has stayed. Thank you. Mr. Booker? Your Honors, I believe Mr. Nye covered most of what I was going to say, so if you don't mind, I'm going to give my time to the other objectors. Okay. Mr. Leighton? I don't think I have eight minutes of material, but I do have five. But let me address a few points. So let's suppose you're Mr. Mullis, and you get this notice that's all phrased in terms of sales. And you look at that and say, okay, I can be part of this class. I can submit a claim for my sale claim. I was okay with that transaction. Not so much with my purchase, but I'm okay with that transaction. They are logically distinct. Mr. Mullis bought and sold months apart. My example of mine is years apart. They are logically distinct independent transactions. And when the notice comes, we'll think of it in that way. So there's a reference earlier to we'll look at the website, and then you can see the settlement agreement. But, of course, the settlement agreement doesn't actually say anything about buyer's claims, not expressly, not something that Mr. Mullis could possibly have understood. I'm not even sure the lawyers would understand it, but certainly not a layperson. Except that if you were pretty sophisticated as a layperson, you might understand that your claim as a buyer isn't just that money went to a  There are two other aspects of a buyer's claim that play into the value of those buyer's claims. One of them is that the way this system worked, the broker who purportedly was representing the buyer has an incentive not to get the best possible price for that particular buyer. The other is that the buyer doesn't get all the information. So the seller enters into this contract that details how this whole thing works, who's going to pay what and how much will be paid. But the buyer doesn't get that kind of thing. But if the buyer looks at the settlement agreement, and, of course, that has to be construed as a whole, and they understand that maybe they paid too high a price not just because there was this commission, but because of the incentives built into this system. And so they know they should look and see if there's something where they're waiving a claim for where they paid too much. And there is something in the settlement agreement about that. So in the settlement agreement, there is a carve-out. It's a carve-out that says, look, if you've got a problem with your individual broker, this person you worked with, you think they breached the contract or something, then this doesn't waive that claim. But there's a carve-out to the carve-out in which it says, but it does waive a claim if you think you paid an excessive commission or a home price due to that. So what we're saying is that we have this special provision for my ability to sue my broker, and there it says, okay, we are having you release your claim about your particular broker. But there's nothing like that about buyer claims generally. So let me turn then to this idea that we now have. And let's assume that you find that the settlement's fine and it does cover the buyer claims, which we of course think it does not. And so then we're in this world where we have a single pot of money, and that pot of money is going to get split up. And at this point, it's going to get split up according to whatever was on the claim form, that is, what sellers paid to brokers. No buyer claim at all. There's no indication in this case in the record that anyone stood up for the buyer claims. And sure, in this case, the buyer claims are all people who also had seller claims, but they are a separate claim. And at least the buyer claims should have some value. That is, if you sold a house and didn't buy one and I sold a house and did buy one, there ought to be some recognition that there is a value to that. And there's nothing, not just in the way that people were told that these monies will be handed out, there's nothing in the trial record or otherwise to suggest that there's going to be any differentiation like that. So what do courts do when there are these two kind of competing interests? Because at this point, it's a single pot of money, so they are competing interests. Well, typically, we appoint someone to be in there and talk about these claims. And that's what you get in the case law that started with Amcam and went into these other cases like literary works, where you have someone coming in and saying, okay, we understand, like in literary works, that you all have all three of these categories of claims. But still, someone needs to be in there to protect the people and advocate on behalf of this particular class of claims. So we don't think that you should just affirm, even if you conclude that the factual predicates are the same, which they're not, that what you instead should do is send this back to the district court and say, no, you've got to have somebody speaking to these buyer claims. Now, some of the cases where the courts didn't do that are ones where the courts said, okay, the district judge has lived with this case, watched the trial, was very involved. The judge is enough to protect that. But again, this case was never tried as a case with buyer claims. It was always a purchase claim case. And so there's nothing in the record here to suggest that this judge was ever in a position even to be asked to do that, much less that he did that. In any event, we ask that you provide some protection for these folks like Mr. Mullis who have an additional claim. Thank you. Thank you. Mr. Buechmann. Good morning, Your Honors. Michael Buechmann on behalf of Monty March and Robert Friedman who are the Real Estate Board of New York, or REBNY as I shall call them, plaintiffs objecting to the scope of the Burnett and Gibson settlement releases. The settlement releases in the Missouri actions seek to release all claims that have anything to do with residential real estate commissions. But REBNY was never part of the Burnett action. In fact, REBNY was never named or mentioned in the complaint at all. We object to these releases because REBNY is not part of NAR. In fact, in 1994, REBNY broke away from NAR long before the NAR conspiracy began in order to create its own independent rules, its own independent code of ethics, and has operated independently from NAR since then. Your Honors, a conspiracy is defined by the nature of the agreement. Here, the nature of the agreements are quite different. The REBNY actions involve an anti-competitive agreement concerning residential real estate commissions in New York City, which are exclusively governed by the Real Estate Board of New York's rules, code of ethics, and handbook. Conversely, the NAR actions involve an anti-competitive agreement concerning residential real estate commissions in NAR-controlled areas where NAR rules and the NAR code of ethics govern. Ms. Scherz, March, and Friedman object to the unlawful and overreaching attempt to include the entirely different REBNY conspiracy claims concerning New York residential real estate commissions and release those REBNY claims in the Missouri action. It is well settled that a class action release can only release claims if the release conduct arises out of the same nucleus of operative facts or is based upon the same factual predicate. This is commonly referred to as the identical factual predicate test. Claims which depend on different facts cannot be released under the identical factual predicate test. Separate claims, but superficially similar conspiracies, do not share an identical factual predicate. That's the currency conversion case we cite in our brief 264 FRD 100 from the Southern District of New York in 2010, and also the Alton Jones Foundation versus Chevron case, Second Circuit case, 1996, 97, Fed Third 29. A similar alleged conspiracy is not the same conspiracy for application of the identical factual predicate test. That's the Hess case out of the Ninth Circuit. While distinct conspiracies in the same industry may look alike, that does not mean that they are a single conspiracy and share the same identical factual predicate. The issue presented on appeal here is whether the March and Friedman actions in the Southern District of New York share an identical factual predicate with the Burnett and Gibson actions in the Western District of Missouri. The answer is no. No, because Rebney and Gnar cases involve two separate and distinct conspiracies based on two separate rules concerning completely separate markets. Indeed, the Judicial Panel of Multidistrict Litigation previously considered the relatedness of the Rebney and the Gnar actions in connection with the Gibson plaintiff's 28 U.S.C. 1407 motion, in which the Gibson plaintiff sought to transfer all the actions outside the Western District of Missouri into the Western District of Missouri. During the MDL proceeding, the MDL panel received scores of judicial admissions from the Rebney defendants differentiating Rebney from Gnar. The panel received these admissions demonstrating that Rebney and Gnar are completely different and do not share an identical factual predicate. The Rebney defendants made patently clear the Rebney action involved different rules. Indeed, the Rebney rule is even more egregious because it requires an equal commission split, different codes of ethics, different geographic locations, and different defendants. For example, Intervenor, the agency, stated in its JPML brief that the distinct quote, the distinctions between Gnar's rules, code of ethics, and handbook and Rebney's rules and code of ethics are meaningful and significantly distinguish the March and Friedman actions from the Western District of Missouri actions and the Gnar cases. Similarly, Intervenor's Brown-Harris-Stevens stated in its briefs the quote, the Rebney actions do not utilize the Gnar rule or have a functional equivalent to the Gnar rule at issue in the Gnar actions. They also said in their brief quote, quite simply, there is no conspiracy or agreement to follow Gnar amongst the defendants in the Rebney actions. Now, the Rebney defendants repeated these statements from their briefs during oral argument in the MDL proceeding. And after hearing the litany of distinctions by the Rebney defendants, Judge Kennelly of the Northern District of Illinois quite poignantly asked counsel for Gnar, I'm sorry, for Rebney, and I quote, isn't there some rule that is being followed in all these situations that has some degree of similarity or some overlap with the Gnar rule? And counsel for Rebney answered quite succinctly and definitively by responding and saying, not with respect to the Rebney case. Now, if you look at the rules, there are some similarities. I mean, this is a weird conspiracy if you just look at conspiracy law generally, because you need an agreement between parties. And we have recognized in all sorts of contexts that there may be parallel conspiracies operating that are separate, distinct, but really with the same criminal end, right? I mean, you may have three or four drug conspiracies that are operating side by side in a criminal context, moving the same drugs, dealing with some of the same street dealers, but are separate and distinct, right? But they can also be put into sort of a spoken wheel conspiracy. We'd say they are tied together because there's some overlapping participation and the conduct is sufficiently similar. Your claim is that that is not possible with Rebney, and my question simply is, why not? That's correct, Your Honor, because Rebney broke away from NAR back in the early 90s to create its own separateness, its own independence. It created its own rules for that purpose. It's never been subject to NAR's rules whatsoever. And in Rebney, New York, in New York City, Rebney rules govern. The NAR rules have no application there. Rebney governs. And for that reason, there has to be two separate conspiracies here. And, in fact, you heard the quote from the Brownhatter-Stevens intervener that there is no conspiracy or agreement to follow NAR amongst the defendants in the Rebney actions. That's at 1295 RDOC 1562.10 at 6. Thank you. Thank you, Your Honors. Mr. Brown? May it please the Court, my name is Nate Brown, and I represent the intervening appellants Doyle, Guerra, and Winters. This appeal turns on three errors. First, the district court applied the wrong legal standard to timeliness and adequate representation with regard to my clients. Second, it mischaracterized my clients' legally protectable interests as merely speculative. And third, it approved settlement rule changes that are anti-competitive and ineffective. First, under timeliness and adequate representation, the district court improperly treated my clients as class objectors under Rule 23 rather than as third-party interveners under Rule 24. My clients are not members of the objector class. They are on the opposite side of the V in this litigation, and plaintiffs cannot adequately represent defendants' interests as a matter of law. The court also conflated pretrial intervention with post-trial intervention for the purpose of appeal. Under the United States Supreme Court's ruling in United Airlines v. McDonald in the Eighth Circuit precedent, which closely followed in Chiglo v. City of Preston and Jenkins v. Missouri, intervention is timely for the purpose of appeal when filed within the appeal period. And that is exactly what happened here. Second, direct and protectable interests. These interests are not speculative. NAR and Burnett admit the settlement will be funded by approximately 1. million realtors paying $150 of their membership dues. That creates an immediate and concrete financial obligation upon final judgment, not some contingent liability on future events, as the appellees argued, in the mutual liability of Metro St. Louis sewer district cases, where those liabilities only became actualized after a series of future events. In one case, one would have to win a litigation, and a guaranteeing party would have to default. And in the other case, it was still questionable whether the city was going to foot the bill. So the district court, in some, erred in dismissing that obligation as merely hypothetical. Third, anti-competitive and ineffectual rule changes. The settlement mandates buyer-broker agreements and suppress MLS commission disclosures in ways that disproportionately advantage the larger brokerage firms that co-drafted the settlement and impair competition for the independent agents like my clients. That is direct competitive harm. Even more critically, the early implementation data before the district court undermined the settlement's core premise. Commissions have not decreased, transaction volume declined, and market frictions rose. And so, to the court's point, this is a weird conspiracy. The evidence contradicts any finding that the settlement is fair, reasonable, and adequate, and it undercuts any claims that a conspiratorial scheme caused damages to the plaintiff class at all. In some, the district court applied the wrong legal framework, disregarded concrete economic injury, and approved rule changes that distort competition without producing the promised consumer benefit. We respectfully ask this court to reverse the denial of intervention, vacate approval of the settlement, and remand for proper consideration. Thank you. With that, I can see the rest of my time and reserve for rebuttal. Thank you. Mr. McCrackett. Thank you, Your Honor. I was a little surprised to hear Mr. Layton talk about the notice that somehow Mr. Mullis didn't get proper notice because in the reply brief for the Mullis objectors, and this is in the first appeal, the Anywhere and REMAX appeal, on page 25 specifically states, Mullis does not challenge the adequacy of the class notice. So, I don't know if they've changed that theory or not, but I do know that the class notice was perfectly clear. People knew that they were releasing all claims, including claims for inflated home prices, which is the damages theory that the Mullis objectors have because the buyer class didn't pay any commissions. Now, with regard to this idea of REBNY, as I just heard it, it turns on this idea that there were two separate conspiracies. And I just want to make clear that from the Burnett case, that's not how the case was pled. That's not how it was litigated. That's not what the evidence showed, and that's not how the case was tried to a verdict in Burnett. There wasn't one conspiracy in New York City and another one in Washington, D.C., and a third in Chicago. There was one conspiracy, not a separate conspiracy on every single MLS. That would be over 600 conspiracies. There was one conspiracy that settled on a single objective, which was to require sellers to pay buyer commissions, and that was implemented through local MLS rules. The local rules were the mechanism, not separate conspiracies. And the district court, having presided over five years of litigation and a full trial in the merits, all knew that. And so let's just take New York, since that was where it was raised. It fails on the pleadings, it fails on the evidence, and it fails on judicial admissions, the argument made here. The Gibson complaint, a companion case, expressly alleged an anti-competitive agreement nationwide that included New York City. And that alone is enough to bring those claims within these releases. You can always settle claims that are actually at issue. It's a disjunctive test, right? It's or. You can settle pled claims or unpled claims that arise from the same factual predicate. Here, Gibson alleged that very nationwide conspiracy that included New York City, and it's resolved by these settlements. But it's not just the pleadings. It's also the evidence. Redney's rules operate just the way other rules, the NAR rules, operated nationwide. And that was specifically at issue in Burnett. You know, one of the issues in these antitrust cases is finding, they call it the but-for world. And that's a market where the challenge rules don't exist, so you can use it for comparison purposes. And that was really difficult in Burnett, precisely because the conspiracy here was nationwide and extended to all corners of the country. In fact, it was so, that was such a problem to find the but-for market, we had to leave the country and go all the way around the world to Australia to make that the but-for market. And there was expert testimony on both sides in that. There were extensive review of the defendant's documents. We actually had to fly a witness from Australia to Kansas City in the Burnett trial, specifically because of that point. And all of that evidence further confirms that the defendant's conspiracy extended into New York just like it did everywhere else in the country. And this idea that Redney had split from NAR in 1994, well, these rules came about in 1992. And more importantly, NAR members are in the New York market. They can affect it. That's how they do it. That's how they pass these rules locally. So it's really no different from any other market. And, you know, NAR and Redney share the same history, going back decades of having these different rules. I mean, first it was explicit price controls, and then it was suggested, a rate card where commissions were suggested. Then it was punitive splits, like this court confronted back in the 70s. And it worked up to having these rules that require the seller to pay the buyer's commission. Absolutely, Redney was part of it. And the good news for the New York objectors is, you know, Redney's not released by this settlement. I mean, NAR, you have to have an affiliation with NAR to be released by this settlement. So they don't have that problem either. And then finally, there were the judicial admissions made by the New York objectors themselves, their lawyers. See, two weeks after we won our Burnett trial, you know, everybody read about it in the paper, and then all of a sudden they filed this March complaint, which was substantially copied from the Burnett complaint, and specifically said, these rules are functionally the same. And the district court properly held the objectors to those admissions, because it dovetailed so perfectly with what we all knew and had seen through five years of litigation and taking the case to trial on the merits. Now, with respect to the statement, the elephant in the room is that this case was expanded too much. The reason this case is expanded is that nationwide settlement is far superior to the type of piecemeal, state-by-state litigation that the objectors are proposing. Broad settlements are good. They promote global peace, just like here, and that makes settlement of large antitrust cases even possible. No defendant's going to pay substantial sums just to turn around and be sued again and again for the same conduct elsewhere. And this case was no exception. All the defendants made clear that settlement could only take place on a nationwide basis. But that's a good thing. That's good because it maximizes recovery for the class. Precisely because nationwide settlements have significant value, defendants will always pay more to settle nationwide than with a patchwork of limited settlements. All fragmented litigation would do would be to dilute recoveries, create inconsistent outcomes, and delay relief, and that wouldn't be proper. I do want to briefly defend... I don't think the district court needs defending, but there were statements that the district court was punitive or draconian or somehow had an overt dislike of the objectors. That's just not the case. The record is pretty clear that the district court bent over backwards to give everybody a fair hearing. There was no limit on briefing. We had one objector submit 122 pages, single-spaced, of objections. And the district court looked at it all. And the fact that some of the defendants think maybe they would like some discovery that they thought might turn up something else, it was never going to turn up anything else. These verdicts were so much more than the defendants' ability to pay. There was never any question about that. Counsel, this is Judge Smith. I have a question.  What's the best legal authority and basis for the district court's requirement of personal appearance for objectives? I would say it's the 11th Circuit. Why is that fair in accord with due process? Yes, Judge Smith, I'd say two things. One, this court's decision recently in T-Mobile where the court said you have to, if you subject yourself to the process by objecting, you have to play by the rules. And in that case, the court upheld what I consider to be a much more burdensome requirement, which was to sit for a deposition. And here, the court only required that people come to Kansas City for a hearing. And I think, you know, with knowledge of how the whole thing went, I think the district court was getting at the fact that there were so many lawyer-driven objections in this case, and we had realtors who were disgruntled, who were making objections, and we had one person that was so disturbing, the marshals had to get involved. It was a big deal. And all the district court said was that if you want to insert yourself into a situation with over a billion dollars on the line and practice changes that could give everybody great relief, then it's not a big deal to come to Kansas City for one day so that the district court could look each objector in the eye and figure out, was this done in good faith, was this client-driven, or is this attorney-driven? So I do think that those two authorities fully support the district court's order. I also would point out that in addition to waiving the arguments, the district court also fully considered and overruled each objection on the merits. Very briefly, with regard to allocation, and we've cited the authorities in the briefing, this case isn't some case where you have a single defendant with a single settlement. These were multiple defendants who were jointly and severally liable for the same conspiracy, and we were settling over the course of many months on a rolling basis. And it was very important that final approval take place as soon as possible because we had defendants here who were saying, we are thinking about bankruptcy. And many of these settlements, the terms are that the money has to be paid once final approval is accomplished, and it was important to get final approval done as quickly as possible, and the district court took that into account, properly so. Thank you. Thank you. Mr. Michael. Thank you, Your Honor, and may it please the court, Chris Michel on behalf of the National Association of Realtors. The NAR settlement is the largest of those before the court this morning and among the largest in antitrust history. NAR entered that settlement after carefully balancing competing considerations. On the one hand, NAR strongly believes that plaintiffs' claims are legally flawed and that if we were here today appealing the jury verdict, we would have very persuasive arguments for reversal. On the other hand, immediately after the verdict, NAR faced additional nationwide litigation threatening truly massive liability, and NAR lacked the resources to pay even the Burnett judgment. The global settlement that the parties negotiated reflects a comprehensive response to those competing considerations. It demands more than half of NAR's available assets, $418 million, in addition to another $30 million from NAR-affiliated brokerages, and it requires the most dramatic practice changes in the real estate industry in decades. In return, it brings a decisive end to the nationwide litigation challenging NAR's rules and practices as targeted by the class plaintiffs. The scattered objections before this court do not come close to showing that the district court abused its discretion in approving this historic settlement. The objectors challenged the settlement on largely weak tangential grounds that reflect their own idiosyncratic preferences rather than any unfairness in the settlement as applied to the class as a whole. And if any objector really believed that their claims were more valuable, they could always have opted out. Ultimately, an overwhelming majority of the class accepted this historic and highly favorable settlement and this court should not allow the objector to prevent the class from receiving relief. I'd like to address just a few of the objections that have come up today. There have been a number of objections about the nationwide scope of the class, of the release, and I think there's a very straightforward response which has been alluded to, but it's important to note that this case settles not only the Burnett case, that's the case that involved Missouri and a handful of other MLSs, but it also settles the Gibson and Umpa and Murrell class actions. And two of those class actions, which were filed after the Burnett verdict, are nationwide classes. They are defined in terms of classes spanning the whole nation, and so in settling on a nationwide basis, NAR was simply settling the claims against it. There's no complicated factual predicate analysis. The settlement corresponds exactly to the scope of the claims in terms of the nationwide geography. The buyer release issue has been addressed to some extent already, so I won't belabor that. I'll just note that I think there, the same factual predicate analysis is key, and in conducting that analysis, what the court should look at is the scope of the conspiracy. The conspiracy alleged is that brokers on the seller side conspired with brokers on the buyer side and inflated the commissions. That inflicted two injuries. It inflicted an injury on the sellers in the form of higher commissions, and it inflicted an injury on the buyers in the form of higher prices. The factual predicate for the higher home prices, the factual predicate underlying those two injuries is the same. It's the same conspiracy. The argument that the buyers would make in their separate case is the same conspiracy that the sellers made in this case. In fact, it's not even clear that you could split those claims in the way that the objectors, I think, are suggesting, and under straightforward principles of res judicata. If there had been a final judgment in this case on the seller claims, there's at least a strong argument that the buyer claims would have been part of the res judicata release in any event. There's been some discussion about what value the buyer claims have. I do want to make this point. I think Mr. Van Oort made it as well. NAR would never have settled this case for $418 million if the buyer claims had not been released. So it's not accurate to say that there is no value corresponding to the buyer claims. $418 million would not have been the number without the buyer claim release. I think what my friends for the objectors are saying is that there is not a line item accounting of exactly how much value is attributed to the buyer claim release. But as this court has said in cases like General American and Petrovic district courts and settling parties, do not have to provide that kind of line item accounting. They simply have to agree on a final fair number. In addition, there is a democracy element to this. Most of the class, and I believe one of my friends in the earlier argument made this point, most of the class is in the position of this objector. They both sold homes and bought homes within the class period. This is not an idiosyncratic position. About three quarters of the class was in that position and most of the class, by an overwhelming majority, decided to go with the settlement. As Mr. McRae said, there have been 2.5 million claims settled, something on the order of 30-something objections and opt-outs. And again, if the objectors really thought that their buyer claims were more valuable, nothing would have stopped them from opting out and pursuing those claims separately. I'll briefly address the Rebney objection. This is about the New York Real Estate Board. There's a short and direct answer to this, and it is the Gibson complaint. This is parallel to the first point I made about the nationwide settlement. If you look at paragraph 182 of the Gibson complaint, it expressly says, I'll just read a line or two because I think this is helpful, a handful of MLSs, fewer than 5%, are not exclusively owned or operated by NAR. These MLSs are nevertheless typically controlled by realtors and are not fully independent from NAR. These MLSs and their participating brokerages are generally subject to the same or similar anti-competitive restraints. And then there's a list of different MLSs that the Gibson complaint, which was settled in this case, believe that applies to, and one of them is Rebney. So again, this is a straightforward way to resolve the objection without complicated, you know, same factual predicate analysis. All we did was settle a claim that was directly asserted against us in the Gibson complaint, which, as I said at the outset, was one of the actions that was settled in this case. I do think it's also noteworthy, and Mr. McRae mentioned this, that Mr. March and Friedman, the objectors who are raising this, only brought their lawsuits involving the New York board after the verdict in this case. And in those complaints, they described their allegations as the same or similar to the ones in this case. It's not surprising they did that, having seen the massive verdict that was delivered in the Burnett case, but that does make it very difficult for them to turn around years later when it's more convenient and say, actually, these were not the same allegations. Again, if they did not want to be bound by the settlement, they could opt out of the settlement. That's always available to any objector. And as Mr. McRae also observed, Redney itself, this is an important point, is not released from the settlement, so the separate case against Redney can proceed independent of this case. I'll briefly address the objection from Mr. Doyle, Ms. Doyle, and the other interveners. I think there's a straightforward answer to this one as well. The district court explained in paragraph 37 of its opinion that this motion for intervention was untimely. This court, in the Uppenor case, said that when this court is reviewing a denial of a motion for intervention, it reviews for abusive discretion. In particular, that was a class action case, so it's very parallel to this one. And the problem in that case was that the intervention was untimely. This court described it as the ninth inning with two outs. And I think we're not in baseball season, but the same analogy applies here. This intervention motion was filed four days before the fairness hearing, approximately seven months after the preliminary approval, and the district court was well within its rights, given all of the parties that would have been affected by disrupting the process at that time to deny it. As untimely, certainly did not abuse its discretion in doing that. The in-person requirement came up. Judge Smith, you raised that. I think Mr. McRae addressed it well. I think I might address it even more quickly by saying if you look at paragraph 37 of the district court's opinion, the district court makes clear that notwithstanding its finding of a waiver based on non-appearance, the court rejected all of the objections on their merits and the next 50 pages of the district court's opinion are laying that out in detail. That careful analysis is entitled to respect. It's within the district court's discretion and we respectfully ask this court to refer. Thank you. Mr. Dussel. Good morning, Your Honors, and may it please the court. Chris Dussel representing the Home Services appellees. The Home Services settlement delivered $250 million of cash value and significant practice changes to the class. It ended years of costly and burdensome litigation and, very importantly, it removed the very real prospect of reversal of the Burnett trial win either on post-trial motions or on appeal to this court. That settlement is fair, reasonable, and adequate. As my friends on our side have mentioned, it is something that the class has weighed in heavily in support of with fewer than 40 opt-outs and very, very few objections. And I would note only three objections to the Home Services settlement. I want to, understanding the number of speakers that are here today, I want to just explain where we fit in the puzzle and what I'm going to be addressing. The Home Services settlement, we are a brokerage that was part of the Burnett trial, so we are therefore in a similar situation to the brokerage defendants who you heard from in the first group. The reason we're in this group is because of the timing of the settlements. But the objectors challenging our settlement are the same three and many of the issues are the same. The flip side of that point is that there are four appellees in this group who have made objections but not to our settlement. So I think that's very, very important to keep in mind that Friedman, March, Monestier, and Doyle, none of their arguments were raised as objections to our settlement. Now, I want to respond very briefly to just a few issues that have come up regarding the objections that are made to our settlement, but first begin with a broad observation, which is that all of the objections raised to the Home Services settlement are contrary to established Eighth Circuit law and the objectors do not point to Eighth Circuit law that supports their position. So we've cited in the briefs to the Petrovic case, the Marshall case, the General American case, the Target case. They make different points, but collectively this binding precedent precludes these objections. But now let me speak specifically to some of the points that have been raised by the objectors today. So let's turn to Mr. Mullis's objection to the release of the buyer claims. One thing that I think is very important for this court to keep in mind is that the grand total of members of this class who objected based on a concern about releasing their buyer claims is one. Mr. Mullis. He's the only one, and he happens to be the one who also is bringing class actions elsewhere, raising the buyer claims and challenging the same conspiracy. But the class overwhelmingly did not have a concern about releasing these alternate theories that are based on exactly the same conspiracy. So that goes to the same factual predicate test, and I think the precedent that we cite in our briefs is very clear on this. The factual predicate is the alleged conspiracy to inflate brokerage commissions, full stop. That is the factual predicate, and you are allowed to release claims that arise from that. The seller claims and the buyer claims all arise from that. Now a couple of points that were raised by my friends on the other side that I do want to address. One concerned the sufficiency of the notice, and I do think it's very important to point out that the notice in the home services case could not have been clearer that the seller claims are being released, and this is in Document Entry 1519-2 at page 8, appendix 590. But there's a section that says, what am I giving up to get a benefit? And it specifically says in this release, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home, including claims as a seller, buyer, or otherwise. So the notice could not have made that more clear, but it didn't stop there. At page 12 of the same Document Entry, there's a heading that says, are there other similar cases? And it specifically lists Mr. Mullis's other cases. It lists the Batten case. It also lists the Lutz case, which is currently pending in Florida, which is where Mr. Mullis is challenging the home services settlement as a buyer. It specifically mentions this, and then it says at appendix 594, the settlement may release any claims against home services asserted on behalf of plaintiffs or members of the putative classes in those cases. The notice could not have been clearer that these claims were being released. Also on this issue of the carve-out, which was raised, what they're labeling, the carve-out, is actually 100% consistent with the release, and it's actually referenced in this same paragraph of the notice as well. It says that the settlement may release claims against home services asserted on behalf of plaintiffs or members of putative classes in those cases, and then in the settlement itself, the settlement makes clear in the provision about claims against brokers that this is the scope of the release. So it says the release, and this is, excuse me, at 1518-1, page 24, appendix 536, and this is paragraph 31. And it says the release does not extend to any individual claims that a class member may have against his or her own broker or agent based on breach of contract, breach of fiduciary duty, malpractice, negligence, or other tort claim. And then it says, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in those actions. This is not an inconsistent carve-out. This is reiterating that the release extends to precisely that type of claim. The last point I'd like to address is one of my friends on the other side made a point about a request for financial information that was denied. Just to be absolutely clear, there was no such request for financial information as to the home services settlement. I believe that may have been one of the settlements that was addressed in the first group of appeals here. And so I just want to be absolutely clear on that. There was no request, and the court did, in fact, credit the evidence submitted by the plaintiff's counsel that they had very carefully assessed and evaluated a home service's ability to pay. So with that, unless the panel has any further questions, I would yield the rest of my time. Thank you. Thank you. Mr. Pospisil. Good morning, Your Honors. Mike Pospisil. I'm here today on behalf of my clients, Brown, Harris, Stevens, and the agency of their opt-in brokerage firms. I'm going to try not to repeat what my colleagues have said already. I know we're getting kind of saturated here. There's a lot of overlap here. But quite frankly, the Marsh and Friedman petitions or complaints that were filed in New York were simply copycat petitions. They were filed after the substantial verdict was obtained in Burnett. And like my colleagues said, unsurprisingly in their complaints that are filed in New York City, there's a lot of references as to what happened in the Burnett case. And the allegations were pretty much the same. And quite frankly, Your Honors, the conspiracy here, like Judge Erickson pointed out, you can argue it looks different, but the conspiracy is to inflate broker commissions. And that has occurred both in the claims, the allegations that Marsh and Friedman made in New York and the same allegations that are made below in Burnett and in the case of the Gibson, the Class Action National Council. So clearly under the law of this circuit, the same factual predicate test comes into play. The predicate is, again, the conspiracy to inflate broker commissions. And what is also the same across the board, nonstop, I don't care if you're in New York or if you're in California or if you're in Minneapolis, there was injury to the sellers in the course of higher prices. Injury was the same. The conspiracy was the same. Now I want to actually, for my clients, it's important to know if you step back, my clients operate nationwide. So they are not going to put millions of dollars into a settlement that we're going to have to start carving out various sections across the country, especially when the allegations are essentially the same, the same conspiracy to inflate broker commissions. It just would not make sense. You hear some language about this, they keep saying the word identical factual predicate. There is no such requirement. If there was a requirement of identical factual predicate, there would never be a nationwide class action settlement. It would just never, ever occur. That's why this court takes the rational view, as does the Second Circuit, as does every other circuit in the country, that all we need is a same or similar factual predicate. And we have that here. In closing, Your Honors, I would say that this claim, this case, as far as my clients are concerned, directly on point are the Thompson case and the General American case decided by this court. Absolutely on all fours in the terms of the factual predicate situation we have here. Same conspiracy. Revenue is no different than any other of the multiple MLSs across the country. There's simply no difference. My clients bought peace. They want global peace. The settlement is fair, adequate, and should be affirmed. Thank you, Your Honor. Thank you. What's left for rebuttal? I actually have seven minutes. Seven minutes for rebuttal? Yes. Okay. Thank you. I will not take seven minutes. But there are a few points that were raised here that I think require some response. And part of it was, Judge Erickson, you raised this analogy to a drug conspiracy. Where you have dealers and you have suppliers. The Springway class comes out of Pennsylvania. We have a case there, a case that I suppose would be called a copycat case. I'm going to talk a little bit about that phrase too. But we have a case there with relation to the West Penn Multilist. West Penn Multilist has no connection to NIR, just like Rebny. And Your Honor mentioned a spoke-and-wheel conspiracy. The problem that you have here is, imagine a drug conspiracy. You have a street dealer. Imagine they buy from multiple suppliers, which I think for drug dealers is unusual, but that's not my area of expertise. Are the two suppliers, therefore, in a conspiracy with themselves? You say, no, it comes down this way. The axle of the spoke-and-wheel in the Missouri cases is NIR. NIR is simply not there in the Pennsylvania case. That hub, that axle, does not exist. It is not the same conspiracy. It is a separate conspiracy. There was a statement made that I think may have just been misspeaking, but that it's necessary to have an affiliation with NIR to be covered by a settlement here. That's not correct. There's an option for all sorts of different kinds of entities to opt into these settlements. West Penn Multilist is among the entities with no connection to NIR that purported to do that. In terms of the statement that this maximizes recovery for the class, that again runs into the failure of anyone on the side supporting this to provide any evidence of that beside the statement of an interested party, a partner in one of the law firms that stands to make nine or ten figures from this case. The idea that the T-Mobile case is more burdensome simply doesn't stand up to practical review. T-Mobile was a case where they said, well, you can go talk to the objectors. You can put it on the record. You can depose them. The T-Mobile opinion said, you're going to go do it at the time of their convenience. You're going to go do it at the place of their convenience. There is a big, big difference from You're going to give up an hour or two in your hometown to be asked questions on the record. Then you're going to fly to Kansas City from wherever you might be. For my class members, it's 850 or more miles two days before Thanksgiving, or we're going to waive all of your objections. What about the argument that the court went ahead and did the analysis anyhow, and that we may rely upon that? Well, it's interesting to put it in that sense because the order that was entered was functionally the same as the proposed order that was provided by the parties. So I'm not sure that it's really fair to say that the court did that analysis. The court read that analysis, and I suppose agreed with it. But again, this is a case of the court simply taking the proponent's word for it, and that doesn't fulfill the requirements of Rule 23E, which gives an independent requirement that the court review all of the bases of the complaint and make sure that it's fair to the absent class members. We've also talked about how the class members are heavily in support of it. I believe everyone in this argument said that. The problem there is, first of all, the easiest thing to do if you receive a class notice is just do nothing. That's not really a vote in the same way that acting is a vote. But also, we have a situation where, as I mentioned in the previous argument, there's no plan for distribution of funds. So people are being told you need to sit down, write out a legal argument, do research, maybe hire a lawyer in order to get who knows what, because the notice doesn't tell them, the settlement agreement doesn't tell them what they stand to get out of this. Does this matter to me or not as an objector? There's no way for them to really know. At the same time, you have the trial court chilling objections by adding these additional requirements, and that together, whatever you could take from the idea that failing to opt out or failing to object is a vote in favor, that presumption can't exist in that context. Thank you. Thank you. The case is submitted. It's been well-briefed and well-argued. We'll take it under advisement and issue an opinion in due course. Do you want to take a break? No.